**UNITED STATES of America, Plaintiff,**

**v.**

**Kazys CIURINSKAS, Defendant.**

**No. 2:93 CV 97JM.**

United States District Court,
N.D. Indiana,
Hammond Division.

June 18, 1997.

J. Philip Klingeberger, U.S. Attorneys Office, Dyer, IN, Neal M. Sher, Ronnie L. Edelman, Robert G. Seasonwein, Denise N. Slavin, Robert J. Groner, Susan Masling, Susan L. Siegal, William H. Kenety, U.S. Dept. of Justice, Office of Special Investigations, Washington, DC, for plaintiff.

Richard F. James, Luke A. Casson, James, James and Manning, P.C., Dyer, IN, John A. Gibaitis, Algis P. Glamba, Chicago, IL, for defendant.

### MEMORANDUM OPINION and ORDER, FINDINGS OF FACT and CONCLUSIONS OF LAW

MOODY, District Judge.

This matter came before the court on June 19, 1995 for a bench trial. Oversimplifying the details in the interest of providing a brief summary, the United States seeks to revoke the citizenship of defendant Kazys Ciurinskas ("Ciurinskas") because of his service in the Lithuanian Schutzmannschaft during World War II, and subsequent concealment of that service when he applied to immigrate to and become a citizen of the United States.

Ciurinskas does not deny that he served in a military battalion that eventually became known as the Lithuanian Schutzmannschaft. Neither does he deny that the Lithuanian Schutzmannschaft assisted German military and para-military police units in the execution of thousands of Jews and the commission of other atrocities. Instead, Ciurinskas defends by contending that, at the time he served, he believed that he was serving in a military organization, not controlled by the Germans, known only to him as the Lithuanian Self Defense Battalion; that during the

entire period of his service he remained in the Lithuania's capital city during World War II, Kaunas, guarding a fort and warehouses containing food, clothing and other supplies; that he took no part in the commission of atrocities, and was not aware that the Lithuanian Self Defense Battalion was assisting in the commission of atrocities; and that he did not knowingly misrepresent his wartime service when applying for entry to the United States, but instead was never asked a question which dictated that he respond by disclosing that service.

## HISTORICAL BACKGROUND

The following discussion is intended only to provide context for the court's findings and conclusions, and is not part of the court's factual findings. This discussion is largely a summary of the parties' description of the historical events, however, supplemented by evidence introduced at trial (particularly the testimony of historical expert Dr. Richard Breitman), and consists mostly of facts the parties do not dispute. To the extent that the discussion incorporates evidence that is in dispute, however, the court will, later in this memorandum, make specific factual findings supporting this summary.

Prior to 1939, the Republic of Lithuania was an autonomous country bounded by Germany on the west and the Union of Soviet Socialist Republics on the east. In 1939, the U.S.S.R., apparently with Lithuanian permission, established a garrison of 25,000 troops in Lithuania. In June 1940, however, pursuant to a secret agreement between Hitler and Stalin, the USSR invaded and permanently occupied Lithuania. During the period of Soviet occupation, Lithuanian officials, intellectuals and civilians were jailed, sent to forced labor camps in the U.S.S.R., tortured and murdered. The Lithuanian National Army was subjugated to the command of the Soviets, renamed the 29th Territorial Corps, given Soviet insignia and rankings and used by the Soviets to perform menial non-combat tasks.

On June 22, 1941, Hitler breached his agreement with Stalin and Germany attacked the USSR on an 1800 mile front extending from the Baltic sea southward to the Black Sea, and began a push eastward toward Leningrad. In Lithuania (and other regions recently occupied by the Soviets) there was practically no Soviet resistance to the invasion. The German invasion was popularly viewed by the Lithuanians as liberation from the Soviets, and many members of the Lithuanian Army turned on their Soviet commanders. Eighteen German divisions advanced through Lithuania in a little more than three days.

By June 27 or 28, 1941, the bulk of the German military force had left Lithuania and moved east to invade the Soviet Union. Lithuania remained entirely occupied by Germany, however, under the control of German mobile Security Police units known as *Einsatzgruppen*. The *Einsatzgruppen* were composed of company-sized subdivisions called *Einsatzkommandos*. In addition, a mobile unit of the German Order Police, the 11th Reserve Police Battalion, occupied Lithuania with a contingent of 400–500 officers and men.

During the initial period of this German occupation the Lithuanian people viewed the Germans as liberators of Lithuania from the Soviet Union, and intended to re-establish Lithuania as an autonomous political state, establishing a provisional Lithuanian government toward that end. Announcements on the radio and via handbills posted in the Lithuanian capital city, Kaunas, sought volunteers for the "Tautos Darbo Apsaugos Batalijonas," which may be translated as "Battalion for the Defense of National Labor," intended to be the new Lithuanian army.

Germany had a different plan for Lithuania, however, intending to subordinate it and other occupied eastern territories to German rule. Thus, the German police units described above, as well as German civil authorities, refused to recognize the Lithuanian provisional government. It quickly disbanded, no later than August, 1941. The various companies of the Battalion for the Defense of National Labor were then reorganized to serve German purposes, under the control of the *Einsatzgruppe* and the Order Police. The Battalion's name was changed, in Lithuanian, to "Pagelbines Policijos Tarnylos Batalijonas," which translates as "Auxiliary Police Service Battalion." At the same time, the Germans began referring to the Battalion, as they did for all indigenous police

forces in occupied eastern countries, as the *"Schutzmannschaft,"* which roughly translates as "protective group" or "protective force."

The Germans quickly expanded the role of the Schutzmannschaft,[1] implementing them to help carry out the "Final Solution," that is, Hitler's plan to "cleanse" the occupied Eastern territories by interring and/or executing all Jews, partisans (of the Soviets), Gypsies and "Bolsheviks," a term used mainly to describe Soviet Communists and Jews but loosely used as a catch-all for the groups named and anyone else the Germans considered to be an enemy or undesirable. Thus, during the fall of 1941, the winter of 1941–42, and the spring of 1942, the Schutzmannschaft participated and assisted in the killing of thousands of civilians, mainly Lithuanian Jews and Jews in other nearby German-occupied eastern areas.

### CONTENTIONS OF THE UNITED STATES

This action was commenced when the United States filed a seven-count complaint on March 29, 1993, pursuant to section 340(a) of the Immigration and Nationality Act of 1952, as amended, (hereinafter, the "INA"), 8 U.S.C. § 1451(a), seeking to revoke the February 17, 1955, order of this court admitting Ciurinskas to United States' citizenship, and to cancel Ciurinskas's Certificate of Naturalization No. 7262096.

In Count I of its complaint, the United States contends that Ciurinskas's citizenship was illegally procured pursuant to section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1) (as in effect at the relevant time), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not lawfully admitted to the United States for permanent residence. The United States contends that Ciurinskas's admission to the United States was unlawful because he was not eligible for the visa he obtained under the Displaced Persons Act (hereinafter, "DPA"), 62 Stat. 1009, because he assisted the enemy in persecuting civilians.

Count II of the complaint contends that Ciurinskas's citizenship was illegally pro-cured pursuant to section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not lawfully admitted to the United States for permanent residence because he was not eligible for a visa under the DPA because he voluntarily assisted enemy forces during the Second World War.

Count III of the complaint contends that Ciurinskas's citizenship was illegally procured pursuant to section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not lawfully admitted to the United States for permanent residence because he was not eligible for a visa under the DPA because he was a member of, or participated in, a movement hostile to the United States.

Count IV of the complaint contends that Ciurinskas's citizenship was illegally procured pursuant to section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not lawfully admitted to the United States for permanent residence because he was not eligible for a visa under State Department regulations, 22 C.F.R. §§ 53.32–53.33, because he advocated or acquiesced in activities or conduct contrary to human decency on behalf of Axis countries during the Second World War or because of similar circumstances his entry was prejudicial to the interests of the United States.

Count V of the complaint contends that Ciurinskas's citizenship was illegally procured pursuant to section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not lawfully admitted to the United States for permanent residence because he was not eligible for a visa under the DPA because he willfully misrepresented material facts in order to obtain that visa.

Count VI of the complaint contends that Ciurinskas's citizenship was illegally pro-

---

**1.** All unqualified uses of "Schutzmannschaft" in this order should be interpreted as referring to the Lithuanian Schutzmannschaft only.

cured pursuant to section 316(a)(3) of the INA, 8 U.S.C. § 1427(a)(3), and must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas was not eligible for naturalization because he is not and has not been a person of "good moral character" due to both his Schutzmannschaft service and because of the giving of false testimony in order to obtain admittance to and citizenship of the United States.

Finally, Count VII of the complaint contends that Ciurinskas's citizenship must be revoked pursuant to INA section 340(a), 8 U.S.C. § 1451(a), because Ciurinskas concealed and willfully misrepresented material facts in his Form N–400 Application to File Petition for Naturalization, by failing to list the Schutzmannschaft as an organization to which he belonged and by responding negatively to the question whether he had ever given false testimony to obtain benefits under the immigration and naturalization laws.

### EVIDENTIARY RULING

Following the trial of this action the record remained open, per the court's ruling on a motion in limine filed by the United States, see Order dated June 15, 1995, Clerk's docket entry # 109, in order for the United States to take an evidentiary deposition, in Bonn, Germany, of Elmar Wipperfeld, on July 12, 1995. Mr. Wipperfeld was an employee of the German Consulate in Chicago, Illinois, at the time Ciurinskas submitted an application for a war pension. The parties stipulated that the deposition (which will be referred to herein as Exhibit 161), is admissible in evidence, except Ciurinskas objects to the admission of the following portions: page 7, line 9 through page 18, line 7; page 64, lines 6 through 11; and page 76, line 3 through page 77, line 18.

Although the basis for Ciurinskas's objections are not entirely clear, it appears to be that the portions of the deposition objected to consist of questions put to Mr. Wipperfeld by Judge Hertz–Eichenrode, who presided over the deposition, and Judge Hertz–Eichenrode's translation and summary of Mr. Wipperfeld's answers. Ex. 161, p. 13, lines 5–8. Because the deposition was taken pursuant to German law, the court overrules

Ciurinskas's objections, and admits the entire deposition into evidence. The court will not treat the objected-to portions as testimony given by Mr. Wipperfeld, however. Instead, the court considers those portions of the deposition only as providing context for the remainder of the deposition. Exhibit 161 is admitted into evidence.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

The court has thoroughly considered the pleadings, the parties' pretrial stipulations, the testimony of the witnesses (both those who appeared at trial and those who testified via deposition), the exhibits received into evidence, and the parties' post-trial submissions.[2] The court took care to appraise each witness's credibility during the trial. The court has endeavored to draw all reasonable inferences from the evidence.

The court now makes the following findings of fact and conclusions of law pursuant to FED.R.CIV.P. 52(a). To the extent that any finding of fact is subsequently deemed to be a conclusion of law, the court adopts it as a conclusion of law; to the extent that any conclusion of law is deemed to be a finding of fact, the court adopts it as a true fact so found. As to the difficulty of distinguishing between the two, see Miller v. Fenton, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985); moreover, issues such as the "materiality" of a misrepresentation present a mixed question of law and fact. See United States v. Gaudin, 515 U.S. 506, 510–14, 115 S.Ct. 2310, 2314–15, 132 L.Ed.2d 444 (1995).

The court also wishes to make very clear that its findings of fact are based on a consideration of the record as a whole. Put another way, on many occasions a finding of fact that truly qualifies as a **finding** is not based on discrete evidence, but instead results from inferences and conclusions drawn from a host of subordinate facts. As a result, pinpoint citations to record evidence supporting such findings are difficult to provide and are misleading. The misleading nature of the citation arises from the citation's implication that

---

**2.** With the exception of the United States's "Response to Defendant's Reply Brief to Plaintiff's Post Trial Brief," as the United States's motion for leave to file that brief was denied.

it identifies the evidence supporting the finding.

The court therefore must emphasize that its citations to specific evidence in support of a factual finding are intended only to provide a representative example of record evidence that led to the finding. The court has not provided a detailed explanation of the reasoning process involved in resolving every contradiction in the evidence. Suffice it to say that where conflicts exist, the court has attempted to discern the truth by considering the myriad factors involved in that undertaking, such as witnesses' credibility and the inherent plausibility or implausibility of particular explanations of facts and circumstances.

More particularly in this regard, it should be made clear at the outset that the court rejects the testimony of Ciurinskas on all material disputed matters, because the court finds his credibility poor. The court's assessment of Ciurinskas's credibility, or lack thereof, is based upon observation of his testimony at trial, during which he consistently provided evasive, non-responsive answers to straightforward questions (or claimed that he did not understand those questions), and displayed a remarkable ability to remember with clarity events that occurred more than fifty years ago when those events benefit him but claimed convenient lapses of memory regarding details one would expect him to remember (in light of his memory in other regards); his motive to lie and the sheer preposterousness of much of his testimony; inherent contradictions in his testimony on the witness stand; contradictions in his testimony in pretrial depositions; and contradictions between his pretrial testimony and his testimony on the witness stand.

One example from Ciurinskas's testimony at trial is illustrative. Early in his testimony, asked by the government whether Germans ever controlled his battalion, Ciurinskas answered "I didn't see Germans—I never saw Germans—I never saw a German military uniform during that service." Ciurinskas, TT at 457, 1. 1–2.[3] Shortly after resuming his testimony the following morning, Ciurinskas was asked by his attorney whether he was ever "barracks'd" with German soldiers. He replied "No. Not with them. Separately." Ciurinskas, TT at 534, 1.12–13. Asked whether he had ever shared any mess or other common facilities with German military personnel, Ciurinskas answered "I would only see them in town. That's all." Ciurinskas, TT at 534, line 19. The inconsistency with his earlier testimony (which itself is inherently incredible) is plain, and the differing responses show a tendency to quickly provide a negative response to any question perceived as harmful while providing plausible answers to questions which Ciurinskas was able to prepare for in advance. A lengthy example of Ciurinskas's evasion of straightforward questions is at pages 459–467 of his testimony. Ciurinskas, TT at 459–467.

## FINDINGS OF FACT

1. The court has jurisdiction over this case under 28 U.S.C. § 1345. Agreed Upon Stipulations, No. 1, Appendix A to Joint Pre-trial Order filed June 8, 1995, Clerk's docket entry # 99 (hereinafter, "Stipulation 1," "Stipulation 2," etc.).

2. Venue in the Northern District of Indiana is proper under 8 U.S.C. § 1451(a). Stipulation 2.

3. As explained above, Kazys Ciurinskas was not a credible witness.

4. Dr. Richard Breitman, a historian with special expertise regarding Nazi Germany, was a credible witness. The court has given great weight to his opinions, particularly where those opinions are based on contemporary wartime documents admitted into evidence.

5. Larry Stewart was a credible witness.

6. Thomas J. Smith was a credible witness.

7. Walter E. Frey was a credible witness.

8. Rosemary Carmody was a credible witness.

9. Andrew Eitavicius was a credible witness.

---

**3.** All citations in this order to witness testimony in the trial transcript will be in the form "Witness Surname, TT at xx." Line numbers will be given when specific portions of testimony are quoted.

**1174**

10. Birude Ciuris was, generally, a credible witness; however, her testimony was not illuminative of the issues in this case.

11. Anthony Ciuris was not a credible witness.

12. The historical documents admitted into evidence in this case, that is, captured wartime documents, documents from the Lithuanian State Archives, and documents from the Bremen Welfare office, are authentic, or true and accurate copies of authentic documents.

13. Ciurinskas is a natural person who presently resides at 4962 West 82nd Court, Crown Point, Indiana 46307. Stipulation 3.

14. Ciurinskas has also been known as "Kazimeris Ciurinskas," "Kasimir Ciurinskas", "Charlie Ciurinskas" and "Casey Ciurinskas". Stipulation 4.

15. Ciurinskas was born on February 26, 1918 near the village of Rumsiskes, Lithuania. Stipulation 5.

16. Ciurinskas served in the Lithuanian Army. Stipulation 6.

17. Following the Soviet occupation of Lithuania in 1940, Ciurinskas was absorbed into the Soviet Army where he remained in service until the German occupation of Lithuania on or about June 22, 1941. Stipulation 7.

18. During the summer of 1941, Ciurinskas was housed with other members of his battalion in barracks at Sanciai, Lithuania. Stipulation 8.

19. After he had served in the battalion for several months, Ciurinskas requested a discharge from military service. Once his request for a discharge was submitted in writing, it was granted. Ciurinskas was to be discharged in approximately mid-April 1942, but he was wounded prior thereto. Stipulation 9.

20. On April 1, 1942, Ciurinskas was injured while on active duty when he stepped on a land mine. Stipulation 10.

21. On April 1, 1942, Ciurinskas was taken to the Mutual Aid (or Mutual Assistance) Hospital, formerly known as the Red Cross Hospital, in Kaunas, Lithuania for treatment of his injuries. Stipulation 11.

22. Ciurinskas remained in the Mutual Aid (or Mutual Assistance) Hospital for approximately thirteen (13) months before he was discharged from the hospital. Stipulation 12.

23. After his discharge from the hospital, Ciurinskas did not return to active duty. Stipulation 13.

24. On June 22, 1941, when the Germans invaded Lithuania (which at that time was considered to be part of the Soviet Union), the Lithuanian Units of the Soviet Army were called the 29th Territorial Rifle Corps, the 184th Division of which had its principal camp at Varena. In response to the German invasion, a large number of those serving in the 29th Territorial Rifle Corps deserted or quickly surrendered. Breitman, TT at 68, 74–75; Ex. 1 at 12, 14.[4] About 475 Lithuanians at Varena were then held captive for a short time by the Germans under difficult circumstances, with little to eat or drink. Ex. 1 at 15.

25. At the time of the invasion, Ciurinskas was serving in the 29th Territorial Rifle Corps and was stationed at Varena. Ex. 144 at 48; Ciurinskas, TT at 524, 526.

26. On June 23, 1941, anti-Soviet Lithuanian civilian partisans revolted, and, after the Soviet Army retreated, killed 2,500 Jews in a spontaneous uprising. "Another relatively large number of Jews were shot by the Auxiliary Police (partisans)." Ex. 7 at 3.[5] By June 25, 1941, Einsatzgruppe A was encouraging the partisans to carry out pogroms against the Lithuanian Jewish Population. Ex. 89 (Stahlecker Report) at 16–17.

27. By July 1, 1941, 7,800 Jews in Kaunas had been killed through pogroms and "[mass] shootings by Lithuanian detachments." Ex. 7 at 3.

28. The Germans, in order to maintain order and control the Lithuanian parti-

---

4. All citations to "Ex. x" are to exhibits admitted into evidence at trial.

5. All citations to documentary exhibits which are in a foreign language refer to the English translation of the document. The parties stipulated to the accuracy of the translations. Stipulation 52.

sans, augment their own relatively weak manpower, and circumvent the formation of a new Lithuanian military force with independent political goals, quickly sought to subordinate the Lithuanians. By late June 1941, the Germans ordered the anti-Soviet partisans to disarm and began to organize them into an auxiliary police unit. Announcements were made seeking reliable partisans and Lithuanians in the military who did not fight against the Germans to serve in the unit. Breitman, TT at 70–71, 74–75, 80–87; Ex. 1 at 15–16; Ex. 3; Ex. 4; Ex. 6.

29. The Lithuanians initially referred to this auxiliary police unit as the Battalion for the Defense of National Labor, the National Labor Protection Battalion, or the Defense Battalion of Lithuania. Ex. 1 at 16; Ex. 60.

30. The Germans initially referred to the unit as the Auxiliary Police Battalion. Breitman, TT at 85, 102–06; Ex. 60.

31. Within several weeks, the Lithuanians also began to call the unit the Auxiliary Police Battalion. Breitman, TT at 99–100.

32. By July 31, 1941, the Germans gave the official designation "Schutzmannschaft" to this battalion and similar battalions composed of indigenous residents of other German-occupied Eastern territories. Ex. 34 at 1; Ex. 10; Ex. 11. Although this German term became known to the Lithuanians, the Lithuanians usually used their own term "Defense Battalion," when referring to the battalion. Breitman, TT at 99–101; Ex. 32 at § 2 p. 2.

33. Also by the end of July, 1941, the German government had devised a plan, which was euphemistically called "The Final Solution of the Jewish Question," to exterminate the Jewish population of Europe. The plan's first stage—the pogroms and mass shootings described above—succeeded in killing only a relatively small percentage of the large Jewish population in the occupied eastern territories (the "Ostland.") In the plan's second stage the remaining Jews in large cities were relocated to ghettos: areas of the city with restricted access, where the Germans could contain the Jews and dispose of them later. Breitman, TT at 180–81. Jews in rural areas were killed by detachments from the various German police units described above, with assistance from the Schutzmannschaft, as described in greater detail below.

34. The Germans made extensive use of the Schutzmannschaft in carrying out the "Final Solution."

a. Colonel Jager, the officer in charge of Einsatzkommando 3, issued a written report (Ex. 37, hereinafter "Jager Report") tabulating the executions carried out under his command by December 1, 1941. The report indicates that Lithuanian partisans executed 463 Jews at Fort 7 on July 4, 1941, and 2,514 Jews at Fort 7 on July 6, 1941. In addition, the report describes executions of Jews, including children, elders and the ill, communists and other persons, almost all civilians, carried out every few days throughout the countryside by a mobile detachment of 8–10 Germans aided by Lithuanian partisans. By December 1, 1941, a total of 137,346 persons, mostly Jewish civilians, a large percentage of whom were children, had been executed. Ex. 37.

b. During the early months of Germany's occupation of Lithuania "partisan troops" aided the Germans in "extensive executions in the cities and in the countryside." Ex. 89, p. 23–24.

c. A German Army High Command order dated July 8, 1941, (prior to the Germans adopting the term Schutzmannschaft) allowed use of auxiliary police for the "cleansing of larger rural districts" if approved by a "Wehrmacht headquarters." Ex. 6. The term "cleansing" meant arresting and on some occasions executing those designated as enemies of Germany. Breitman at 183–87; see, e.g., Jager report (Ex. 37) at p. 7 listing the killing of 16 Jewish males, 412 Jewish females, and 415 Jewish children from August 25 to September 6, 1941, as a "cleansing in Rasainiai."

d. Because only 8–10 Germans composed the mobile execution squad used to "cleanse" Lithuania outside of Kaunas, extensive assistance by Lithuanian partisans

was required. Lithuanian partisans participated in the executions by helping round up the persons to be executed; cordoning off execution sites; marching the persons to the execution sites; and taking part in the shooting of the persons. Ex. 37 at 17–17; Breitman, TT at 205.

*Ciurinskas's Service in the Schutzmannschaft*

35. In late June or early July, 1941, Ciurinskas left Varena and, under the direction of a Lithuanian officer, reported to a recruiting office on "Misko" Street in Kaunas, where he joined the Lithuanian National. Labor Defense Battalion, effective as of July 1, 1941, assigned to the Fifth Company. Ex. 67, Order No. 7 to the National Labor Defense Battalion, p. 20, 22 entry 518; Breitman, TT at 122; Ciurinskas, TT at 432.

36. Because his friends were in the 2nd Company, Ciurinskas requested a transfer. On July 12, 1941, his request was granted and he was transferred to the 2nd Company of the Battalion. Ciurinskas, TT at 423; Ex. 69, Order No. 12 to the National Labor Defense Battalion dated July 12, 1941, § 12 p. 3 (spelling last name "Cirvinskas"); Ex. 70, Order No. 15 to the National Labor Defense Battalion dated July 15, 1941, § 17 p. 4 (correcting spelling of last name, Breitman, TT at 124–25).

37. Although Ciurinskas claims that the battalion he served in was only known to him as the "Lithuania Self Defense Battalion," Ciurinskas, TT at 424, no matter whether that testimony is true (and the court finds that it is not, see finding of fact (hereinafter, "FOF") 43), clear and convincing evidence establishes that the battalion was in fact the organization which became known as, and is now commonly referred to as, the Lithuanian Schutzmannschaft. For convenience, the remainder of this memorandum will simply use "Schutzmannschaft" to refer to the unit Ciurinskas served in, no matter what time period is being referred to. When necessary for clarity, the term will be qualified by referring to specific companies or battalions.

38. As of October 11, 1941, the battalion in which Ciurinskas served was called the 2nd Schutzmannschaft by the Germans. Ex. 1 at 17 & n. 20. Later, in February, 1942, the 2nd Schutzmannschaft was renumbered to be called the 12th Schutzmannschaft. Deposition of Juozas Aleksynas, Ex. 140 at p. 13–14; Deposition of Stanislovas Gervinas, Ex. 141 at p. 17.

39. The court concludes that, during the fall of 1941 and winter of 1941–42, Ciurinskas served in the 2nd Company of the 2nd Schutzmannschaft.

40. Members of the Schutzmannschaft wore uniforms and were armed, and Ciurinskas was issued and armed with a rifle during his service. Ciurinskas, TT at 447; Deposition of Juozas Aleksynas, Ex. 140 at p. 12; Deposition of Stanislovas Gervinas, Ex. 141 at p. 13.

41. Although there is some evidence of those joining the Schutzmannschaft having taken oaths, the government has failed to establish, by clear and convincing evidence, that Ciurinskas took an oath swearing allegiance to Hitler, Germany and/or the Reich when he joined the Schutzmannschaft.

42. Thus, the government has not established, by clear and convincing evidence, that Ciurinskas knew, at the time he joined the Schutzmannschaft, that he would be serving in a military organization controlled by the Germans. Breitman, TT at 333–334. At the time, a Lithuanian provisional government was being formed and it is possible that Ciurinskas thought he was joining an autonomous Lithuanian military force.

43. Clear and convincing evidence does establish, however, that Ciurinskas knew within a short time after joining that he was in fact serving under the command of the Germans in the para-military police unit they called the Schutzmannschaft. This finding of fact is an inference based on a number of subsidiary facts, including:

a. Ciurinskas, like all Schutzmannschaft members, was paid in German marks. Breitman, TT at 174–76.

b. the Schutzmannschaft was commanded by German officers. On August 6, 1941, the Lithuanian commander was ordered by the Commander of the 11th Reserve Police Battalion of the German Order Police to inform all the Lithuanian enlisted men of the German takeover, to ensure that all orders were obeyed and that Lithuanians in uniform salute the Germans. Breitman, TT at 106–108; Ex. 46; Ex. 34. The members of the Battalion all understood that they were following German officers' orders. Deposition of Juozas Aleksynas, Ex. 140 at p. 14; Deposition of Stanislovas Gervinas, Ex. 141 at p. 15.

c. the Schutzmannschaft members were ordered by the Germans to wear armbands bearing the inscription "Schutzmann." Ex. 10, par. 3.

d. Ciurinskas's denial of having served in a unit by the name Schutzmannschaft strikes the court as evasive. In response to his own attorney's request for a yes or no answer to the question whether he had ever been a member of the Schutzmannschaft, he answered: "It's a very difficult answer. When I was working there, we never used the word Schutzmannschaft, but what some document may have said in Berlin, I don't know." Ciurinskas, TT at 570 1. 23–25.

e. In 1966 Ciurinskas applied to the German government for a war pension. Exs. 96–110. While this, in itself, does not prove that he knew in 1941 that he was serving the Germans (he could have learned that after the war), it does suggest that is the case. This is because Ciurinskas continues to deny, to this day, that he believes he served the Germans. *See* Defendant's Proposed Findings of Fact filed November 13, 1995 (# 40) (explaining that he believed that he was entitled to the pension as a victim of the war.) Because the documents clearly show that he applied for benefits on account of his service, the present denial, and false explanation, appear to be part of the long history of concealment and denial of Schutzmannschaft service described in these findings of fact.

44. As a member of the Schutzmannschaft, Ciurinskas voluntarily served Germany.

This finding is based on a number of subsidiary facts, including:

a. There is no evidence of conscription, but instead evidence of public announcements seeking reliable volunteers. Breitman, TT at 86–91.

b. Initially, Schutzmannschaft members were allowed to take leave on request. Later, they were allowed to take leave after six months' service. Breitman, TT at 176–177; Ex. 70, p. 2 § 5; Ex. 73, p. 2 § 3, p. 3 § 7, pp. 3–4, § 10.

c. While he was a member of the Schutzmannschaft, Ciurinskas on some occasions took leave for a few hours to visit his family members living near Kaunas. Ciurinskas, TT at 457–59, 518–19; Ex. 144 at 94–95.

d. Other members of the Battalion consider their service to have been voluntary. See, *e.g.*, Deposition of Juozas Aleksynas, Ex. 140 at p. 12.

e. Upon giving 14 days advance written notice, Schutzmannschaft members could obtain permanent release from service on the first of the month. Breitman, TT at 91–98; Ex. 34 at § II, p. 4.

f. Consistent with the above policy, after serving in the Schutzmannschaft for several months, Ciurinskas submitted a written request for discharge which was granted. Ciurinskas was wounded, however, before the discharge became effective. Stipulation 11.

45. In the fall of 1941, until approximately October 6, Ciurinskas was stationed at Sanciai, a location in Kaunas. Ciurinskas, TT at 451.

46. While stationed at Sanciai, Ciurinskas admits that he was aware, from newspaper reports and talk in the streets, that the Germans were killing Jews in Lithuania. Ciurinskas, TT at 453–54.

47. Kaunas is surrounded by twelve forts built during the 19th century to protect the city. Breitman, TT at 191, 193.

48. Among other duties, Ciurinskas spent time on guard duty at Fort IV. Breitman, TT at 426–27.

49. In August and September, 1941, more than 1,800 Jews were executed at Fort

IV by "8–10 proven men from Einsatz-kommando 3 . . . in cooperation with the Lithuanian partisans." Ex. 37 at 1, 3, 4, 8.

*The "Special Mission" of September 11–12, 1941*

50. On September 11 & 12, 1941, Ciurinskas was sent from Kaunas along with 140 other members of his company on a "special mission." Ex. 19 p. 5; Ex. 20 p. 4; Breitman, TT at 193–97. The men returned from the mission with no casualties. Breitman, TT at 197–98.

51. The term "special mission" was used as a euphemism for an execution mission. Breitman, TT at 199.

52. Two other members of Ciurinskas's company whose names appear on the order as also taking part in the special mission, Migonis and Guoga, in interrogations in Kaunas in 1980 and 1982, stated that in the summer of 1941 they took part in an operation near Jonava. According to them, the purpose of the operation was to arrest civilians suspected of being communists. The village of Uzusalis is near Jonava. Breitman, TT at 199–203.

53. On September 11 & 12, 1941, the mobile detachment commanded by Jaeger executed 43 persons at the village of Uzusalis in a "punitive operation against residents who provided food for Russian partisans, some of whom had weapons." Ex. 37 at p. 8.

54. The "special mission" of September 11 & 12, 1941, on which Ciurinskas was sent, was the punitive operation against the residents of Usuzalis which resulted in the execution of 43 civilians. Ciurinskas assisted in this operation.

*White Ruthenia Operations Fall/Winter 1941*

55. The region composed largely of the present country Belarus, formerly the western half of that part of the Soviet Union known as Byelorussia, was called "White Ruthenia" by the Germans. Ex. 1 at 27; Breitman, TT at p. 79.

56. The Wehrmacht Commandant in White Ruthenia, von Bechtolsheim, in a written report dated October 2, 1941, noted continued "unrest and acts of sabotage by the partisans in the territory of the Commandant in White Ruthenia," for example, "a wood tar factory was set on fire by armed Jews." Ex. 78 at 1.

57. On October 4, 1941, Jedicke, a German Brigadier General of the Police and SS Brigadier General of the Reich Commissar for the Ostland, "dispatched two companies of the 11th Battalion (Garrison Kauen [Kaunas]) and three companies of Schutmannschaften from Kauen to Minsk under the command of Major Lechthaler who is Battalion Commander of the 11th Reserve Police Battalion." Ex. 29.

58. Pursuant to the above order, on October 4, 1941, Lithuanian commanding officers Captain Kviecinskas and Battalion Commander, General Staff Major Impulevicius, ordered most of the 2nd Schutzmannschaft Battalion to depart on October 6, 1941, to the Minsk–Borisov–Slutsk area of White Ruthenia "directly subordinate to the Commander of the 11th Reserve Police Battalion, Major Lechthaler." Ex. 47; Ex. 24. In the order by Impulevicius, the Lithuanian Schutzmannschaft members were exhorted as follows:

[T]he reconstruction of Europe will take place under the leadership of the Great Reich's Leader after the greatest enemy of all humanity—Bolshevism—is exterminated; and that the nations of Europe will be rewarded with standing in Europe according to merits which they will earn in current battle going on under the leadership of the Great Leader ADOLPH HITLER.

. . . Most of you helped the powerful Great German Army in its efforts, as partisans, to expel the Bolsheviks from our country. We have to continue contributing as much as we can to the final extermination of Bolshevism.

Exhibit 24 at p. 1.

59. The terms "Bolshevism" and "Bolshevik" were used to refer to both members of the Communist Party and Jews. Breitman, TT at 209.

60. Pursuant to the above orders, Ciurinskas traveled with the 2nd Schutzmanns-

chaft to the Minsk area of White Ruthenia on October 6, 1941, where he served until at least December 22, 1941. Ex. 24, p. 3 § 5 entry # 199; Breitman, TT at 79, 206–08. Evidence which causes the court to form this conclusion, and to disbelieve Ciurinskas's denial that he ever served in Minsk includes, but is not limited to:

a. Ciurinskas's name appears as entry # 199 on Battalion Commander, General Staff Major Impulevicius' order deploying the 2nd Schutzmannschaft to the Minsk area. Ex. 24 at p. 9.

b. Ciurinskas's name does not appear in that portion of the order listing the Schutzmannschaft members who were to remain in Kaunas. Ex. 24 at p. 17–18. Although two names of the men who remained behind (entries 12 and 18) are listed on the translation as "illegible," those names are legible enough on the copy of the original document to conclude that they are not the same as, or similar to, "Kazys Ciurinskas." Ex. 24.

c. During his testimony at trial, Ciurinskas "slipped up" in maintaining his denial of ever having served in Minsk. Asked to explain why documents from his pension file indicate that he was wounded in Minsk (Ciurinskas has maintained during the present proceedings that he was wounded in Kaunas), Ciurinskas answered "There are documents that show I was wounded in one place; there are documents that show I was wounded in the other place. They may have been filled out by the battalion headquarters **when I was stationed in Minsk**, and maybe that's how it became reported that I was wounded somehow to do with Minsk." Ciurinskas, TT at 503 lines 10–16 (emphasis added).

d. A Battalion order issued in Minsk on November 6, 1941, deploys Private "Kazys Ciurinskas" on guard duty "[i]n accordance with the order of the [German] 11th Reserve Police Battalion Commander." Ex. 33 at p. 8 entry # 75.

e. A Battalion order issued in Minsk on December 17, 1941, (noted that pursuant to Report No. 239 of the 2nd Company Commander, "Kazys Ciurinskas" was among those promoted to "Private") "for knowing their duties and for conscientiously fulfill-

ing them." Ex. 39 § 4 at p. 1–2 entry # 7. Although the English translation of the original document lists Ciurinskas's promotion as being from "Recruit" to "Private," there is an error in translation. The original document shows Ciurinskas's promotion as from "eilinis" to "grandinis," meaning a promotion from private to private first class. Ex. 39; Eitavicius, TT at 692. This makes Ciurinskas's rank consistent with that in the November 6, 1941, order placing him on guard duty. Ex. 33.

f. In his application for a German war pension, Ciurinskas disclosed that he had been a member of the "Schutzmannschaft Battalion # 12." Ex. 97 at 3. The 2nd Schutzmannschaft only became called the 12th Schutzmannschaft after the Battalion went to Minsk. Ex. 101; Breitman, TT at 137–38, 213–14. In a letter dated July 6, 1967, in support of his application for a pension, Ciurinskas wrote to the German Consulate General in Chicago, Illinois, "I was severely wounded by a land mine explosion while on an official duty assignment **during the return from Minsk**." Ex. 101 (emphasis added.) Also in support of his application, Ciurinskas submitted a travel pass dated December 22, 1941, authorizing him to travel from Minsk to Kaunas. Ex. 98. Although Ciurinskas contends that these documents contain information that he did not supply, and that other information in his pension file is false, all as part of some scheme by the German government to incriminate him falsely, the court rejects this contention for a number of reasons, including:

i. There is no evidence—other than Ciurinskas's allegations—that such a scheme exists (or existed) against him or any other Lithuanian World War II veteran;

ii. Without any evidence that the German government has a motive to implicate him falsely, the allegation is simply implausible;

iii. The information in the pension file is consistent with facts that Ciurinskas admits are true and with other historical facts in this case;

iv. Ciurinskas admits that the signature on the letter dated July 6, 1967, is his;

v. Elmar Wipperfeld was, at the time in question, employed by the German Consulate in Chicago, and responsible for the acceptance of pension (and other benefit) applications. Ex. 161 at p. 19–20, 74. Except in rare cases, Consulate employees did not provide assistance to pension applicants such as by obtaining information to be put in the application or aiding in filling out the forms. Ex. 161 at p. 23–29. Applicants who did not speak German well were referred to German-speaking travel agencies who would act as interpreters and assist in filling out the forms. Ex. 161 at p. 25–27. Although he does not specifically remember the case, Wipperfeld's signature at various places in the pension file maintained by the German government regarding Ciurinskas, Ex. 96 at, e.g., p. 2, 26, indicates that he processed Ciurinskas's application. From reviewing the application and other documents in the file, Wipperfeld believes that no one at the Consulate assisted Ciurinskas. Ex. 161 at 36, 45–47.

61. The 2nd Lithuanian Schutzmannschaft was the only Lithuanian battalion in White Ruthenia from October through at least the end of November, 1941. Ex. 1 at 31; Breitman, TT at 219–20.

62. "Sanitize," "cleanse," "liquidate," "neutralize" and similar terms used in German and Lithuanian wartime documents are all euphemisms for killing. Breitman, TT at 84, 235–36.

63. The historical record establishes (and, it bears noting again, that while defendant Ciurinskas denies participation in these events he does not dispute that they occurred), that from October 6, 1941, through December, 1941, the 2d Schutzmannschaft participated with the German 11th Reserve Police Battalion in a number of killing actions in Minsk and its surrounding area in White Ruthenia resulting in the executions of more than 19,000 civilians, including Jews, Communists, children and the elderly. Breitman, TT at 231.; Ex. 1 at p. 29–35. Among these killing actions were the following: .

a. On the Minsk–Borisov road on the way to the Minsk area, the 11th Police Reserve Battalion, carrying out prior orders, with assistance of the 2nd Schutzmannschaft killed 1,300 residents of the Jewish village of Smolevichi, essentially wiping out the village. Breitman, TT at 229; Ex. 1 at 30–31.

b. On October 8, 1941, two Companies of the 2nd Schutzmannschaft participated in an action near Uzlany Rudensk where "1 Politruk [Red Army political officer], 9 partisans, 1 Red Army member (presumed to be an officer), and 630 other suspicious elements without identification papers, communists and Jews were shot to death." Ex. 42; Breitman, TT at 261–63.

c. On October 9–11, 1941, all three companies of the 2nd Schutzmannschaft participated in the execution of "800 partisans, Communists, Jews, and other suspicious riffraff" near Rudensk. Ex. 43; Ex. 44; Breitman, TT at 233–38.

d. On October 14, 1941, two Companies of the 2nd Schutzmannschaft "sanitized the community of Smilowicze [some 35 kilometers southeast of Minsk] of Jews, Communists and elements hostile to Germans; 1300 heads were liquidated." Ex. 31 at 4.

e. On October 15, 1941, two Companies of the 2nd Schutzmannschaft "were utilized to clear out the civilian prison camp in Minsk; they liquidated 625 Communists." Ex. 31 at 5.

f. On October 18, 1941, one Company of the 2nd Schutzmannschaft "cleared out the civilian prison camp in Minsk and liquidated 1150 Communists." Ex. 31 at 7.

g. On October 21, 1941, two of the three Companies of the 2nd Schutzmannschaft participated in an action at Koydanov where "1000 Jews and Communists were liquidated." Ex. 31 at 10; Breitman, TT at 242–44.

h. On October 27, 1941, all three companies of the 2d Schutzmannschaft assisted the 11th Reserve Police Battalion in herding the majority of the Jewish population of Slutsk—over 5,000 persons—to ditches outside the city where they were executed. Breitman, TT at 244–50; 252–57; Ex. 1 at 32–34; Ex. 30; Ex. 141; Ex. 142. Slutsk District Commissioner Carl wrote a letter dated October 30, 1941, to the Minsk Commissioner General complaining about the

action and the "indescribable brutality on the part of both the German police officers and particularly the Lithuanian partisans." Ex. 30, translation of document 1104–PS at p. 5.

i. On November 7–11, 1941, at least 6,600 Jews living in the Minsk ghetto were executed in order to make room for trainloads of Jews arriving from Germany. Breitman, TT at 257–59.

64. The 2nd Company of the 2nd Schutzmannschaft participated in the killing actions described above in FOF 63(c) and (h). Although the historical documentation does not specify which Company(-ies) of the 2nd Schutzmannschaft Battalion participated in the killing actions described above in FOF 63(a), (b), (d), (e), (f), (g) and (i), the 2nd Company participated in one or more of these events. Evidence that unequivocally establishes this finding includes:

a. German military policy was to rotate the units responsible to conduct killing actions in order to minimize the psychological burden on those involved. Breitman, TT at 265.

b. The 1st and 2nd Companies of the 2nd Schutzmannschaft were more frequently involved in killing actions than was the 3rd Company. Breitman, TT at 266.

c. Other members of the 2nd Company have confirmed that Company's assistance in killing actions. See FOF 65(a)–(b).

65. As a member of the 2nd Company of the 2nd Schutzmannschaft Battalion, Ciurinskas participated in at least one, and most likely more than one, of the killing actions described above. In addition to the opinion of Dr. Richard Breitman, Ex. 1 at 43, evidence unequivocally establishing this finding includes:

a. Veterans of the 2d Schutzmannschaft confirm that members of the battalion participated in the killing actions, by serving as guards to prevent escape, herding victims on foot to burial pits, pushing victims into the burial pits, and doing the actual shooting of the victims. Everyone in the Battalion realized that the Battalion was engaged in exterminating Jews. Deposition of Juozas Aleksynas, Ex. 140 at pp. 27–28, 31, 37, 38, 40–41.

b. According to another former member of the 2nd Company of the 2nd Schutzmannschaft Battalion, all men not assigned to other duties would be utilized to conduct the killing actions. Deposition of Juozas Aleksynas, Ex. 140 at 42.

c. Due to the massive nature of the operation at Slutsk—that is, a population of approximately 8,000 to be executed in two days—a large portion of the Battalion, including the entire 2nd Company, except for a few soldiers who remained behind to guard the barracks and work in the kitchen, participated in the action. Breitman, TT at p. 245–47, 266; Deposition of Juozas Aleksynas, Ex. 140 at p. 38; Deposition of Stanislovas Gervinas, Ex. 141 at p. 20–21. In describing the duties he carried out, Ciurinskas has never mentioned guarding a barracks or working in a kitchen.

d. Order No. 50 by Impulvecius, dated November 6, 1941, in accordance with an order from the German 11th Reserve Police Battalion Commander, removed Ciurinskas (and other members of the 2nd Company) from rations as of November 4 and deployed him on assignment to perform guard duties. Ex. 33 at § 3 no. 75. The executions of Jews to make room in the Minsk ghetto occurred on November 7–11, 1941. That Ciurinskas was assigned to guard duty on these dates suggests that he assisted in the Minsk ghetto executions. Breitman, TT at 232.

e. It is unlikely that Ciurinskas would have been promoted, in December 1941, from Private to Private First Class (see FOF 60(e)) for conscientiously fulfilling his duties if he was not a participant in execution actions. While Ciurinskas contends that the government has not proven in the negative that he was not promoted merely due to length of service, the record is also devoid of any evidence suggesting that might be the case.

f. Ciurinskas's false denial that he ever served in Minsk indicates that he participated in the killing actions conducted there by the Schutzmannschaft, because the denial can only be motivated by shame and/or fear of the consequences of that admission.

66. Ciurinskas's active service ended on April 1, 1942, when he was wounded by stepping on a land mine. Ciurinskas, TT at 575–576; Stipulation 10. In the application for his war pension Ciurinskas, in response to the question "in what unit" did the injury occur, answered "Staff of the Liaison Officer for the Schutzmannschaft Battalion, 4th Fort, Kaunas, Lithuania," (Ex. 97 at p. 3), ambiguously indicating that the injury occurred in Kaunas. In a letter written supporting the application, however, Ciurinskas stated that the injury occurred "during the return from Minsk." Ex. 101. Ciurinskas's hospitalization records show that the injury occurred between 5:00–6:00 a.m., but that he was not admitted to the hospital until 1:45, approximately eight hours later. Ex. 90. at p. 1, 2. Eight hours was sufficient time to reach Kaunas from Minsk or points between the two cities. Breitman, TT at 207; Deposition of Juozas Aleksynas, Ex. 140 at p. 19–20. The court concludes that Ciurinskas's injury occurred during the return from Minsk.

67. Ciurinskas remained in the hospital for approximately 13 months, and did not return to active duty after discharge from the hospital. Stipulations 12, 13.

*Post–Schutzmannschaft activities and immigration to the U.S.*

68. In 1943–1944 Kazys Ciurinskas worked at his cousin's mill in the outskirts of Kaunas, Lithuania. Stipulation 14.

69. In 1944–1945 Kazys Ciurinskas worked as a baggage handler at a railroad station in Breslau, Germany. Stipulation 15.

70. In 1949 Kazys Ciurinskas sought to emigrate and relocate to the United States. Stipulation 16.

71. In May 1949 Kazys Ciurinskas sought the assistance of the International Refugee Organization (IRO) and requested that the IRO certify him as eligible to apply for immigration into the United States under the DPA. Stipulation 17.

72. Kazys Ciurinskas signed an IRO Resettlement Registration Form which stated that he had been employed between 1936 and 1944 as a miller at his own mill. Stipulation 18; Ex. 117.

73. Kazys Ciurinskas' IRO Resettlement Registration Form did not list any wartime service or affiliation with any military or police units. Stipulation 19; Ex. 117.

74. Because Ciurinskas was paid to serve in the Schutzmannschaft during part of the time between 1936–1944, the court concludes, based on FOF 72–73, that Ciurinskas made a knowing misrepresentation to the IRO of his past employment when he omitted his Schutzmannschaft service.

75. Were it not for that misrepresentation, Ciurinskas would not have been certified as a displaced person "of concern" to the IRO. IRO Manual for Eligibility Officers, Chapter VII, Ex. 116 at 31–34; Report of Mario DeCapua, Ex. 123 at 7.

76. Certification that a person was "of concern" to the IRO was necessary before that person could be considered by the United States Displaced Persons Commission (DPC). Stipulation 20; Report of Mario DeCapua, Ex. 123 p. 4.

77. In 1949 Kazys Ciurinskas sought a determination from the DPC that he was a "displaced person" ("DP") as defined in the DPA and that he was thus eligible to immigrate to the United States. Stipulation 22.

78. In 1949 the eligibility criteria for entry into the United States incorporated the IRO eligibility criteria. Stipulation 21.

79. As part of the application process, Ciurinskas was interviewed by the Counter Intelligence Corps of the United States Army ("CIC"). Stipulation 23. A standard question during such interviews was whether the person had any prior military experience. Frey, TT at 606, 612. If Ciurinskas had, during this interview, disclosed that he had served as a member of the Schutzmannschaft or a Lithuanian Self Defense Battalion, this information would have been put in the investigator's report and included in the CIC's final report sent to the CIC, and noted as a discrepancy from the infor-

mation provided to the IRO. Frey, TT at 589–598; Ex. 119 at 3.

80. Because the CIC's report on Ciurinskas indicates (1) no discrepancies from the IRO information (Ex. 121 p. 2 item III) and (2) that the CIC's investigation revealed no evidence reflecting adversely on Ciurinskas's eligibility for immigration (Ex. 121 p. 1 item 3), Ciurinskas did not reveal during the CIC interview that he had ever served in the Schutzmannschaft. Frey, TT at 600; Ex. 119 at 3–4; Report of Mario DeCapua, Ex. 123 at 5.

81. During the period in 1949 when Kazys Ciurinskas was applying to immigrate to the United States, the Lithuanian Schutzmannschaft was among those organizations considered by the DPC to be "inimical" (and thus part of a movement hostile) to the United States. Stipulation 25. The Lithuanian Schutzmannschaft appears on page 20 of the Inimical List, which was in effect in 1949. The Inimical List was used by the DPC in making eligibility determinations. Stipulation 26.

82. Applicants for immigration in 1949 who had been members of the Lithuanian Schutzmannschaft in 1941–42 were ineligible for status as a displaced person under Section 13 of the DPA, unless they could prove both that they had been conscripted into service and that they did not participate in hostilities. Carmody, TT at 637–39; Report of Mario DeCapua, Ex. 123 at 8–9.

83. Under Section 10 of the DPA the burden of proving eligibility for immigration rested on the displaced person. For this reason, and because there were many more applicants for immigration than the number that would be allowed to immigrate, doubts regarding eligibility were resolved against applicants. Report of Mario DeCapua, Ex. 123 at 3–4.

84. Ciurinskas's service in the Schutzmannschaft from June 1941 through April 1942 would have impacted the decision of the DPC to certify Ciurinskas as a "displaced person." Either he would have been denied that status outright, or, at the very least, further investigation would have been conducted.

Report of Mario DeCapua, Ex. 123 at 7–10.

85. A DPC analyst certified Kazys Ciurinskas as a "displaced person" on July 7, 1949. Stipulation 24. In so doing, the DPC relied on Ciurinskas's misrepresentation that he was employed as a miller during 1941–42 and not as a member of the Schutzmannschaft.

86. On July 15, 1949, Ciurinskas applied for a visa to enter the United States pursuant to the DPA, by submitting an Application for Immigration Visa and Alien Registration to the American Consulate sub-office in Butzbach, Germany. Stipulation 27; Carmody, TT at 631–32; Ex. 129.

87. As part of the standard procedure at that time for considering a visa application, the applicant was interviewed by a vice-consul to the American Consulate, with the aid of an interpreter if necessary. Carmody, TT, 622–27; Ex. 128 at 3–4.

88. During the interview vice-consuls relied on and reviewed the applicant's "dossier;" that is, all documentation available concerning applicants, including the IRO Resettlement form, CIC investigation reports and the final DPC analyst's report certifying the applicant as a displaced person. Carmody, TT at 623.

89. During the interview, for males who were of an age making recent military service possible, areas of particular interest included the applicant's place of residence and type of employment during the war years. Carmody, TT at 625–26.

90. At the conclusion of the interview, standard procedure called for the applicant to be asked to swear or affirm that the information provided during the interview and in the documents reviewed was true to the best of his knowledge. Carmody, TT at 627.

91. Ciurinskas's sworn visa application, Ex. 129, indicates that during the interview on his visa application Ciurinskas swore to the accuracy of the information on his IRO resettlement form, that is, that from birth until 1944 he resided in Li-

thuania and that during the years 1936–1944 he was a miller at his own mill in Kaunas. Carmody, TT at 633–34; Stipulation 28; Ex. 113; Ex. 129.

92. If Ciurinskas had disclosed during the interview that he had served in the Schutzmannschaft, an organization on the "inimical" list, his application for a visa would almost certainly have been denied outright. Carmody, TT at 635–38.

93. Even if, instead, Ciurinskas had been allowed an opportunity to prove that he was eligible to immigrate because he had been conscripted and because he had not personally committed atrocities, the facts found by this court show that he would not have been able to offer such proof, or any such proof offered would have been false.

94. If Ciurinskas had disclosed that he served in any organization with a military-sounding name, such as a "Lithuanian Self Defense Battalion," his application for a visa would have been refused at that time and referred for further investigation. Carmody, TT at 635–38.

95. Based upon the information in Ciurinskas's dossier and Ciurinskas's oral interview, a vice-consul approved his application for a visa under the DPA and on July 15, 1949 issued to him Immigrant Visa 374/99. FOF 87–94; Stipulation 29.

96. From FOF 68–95, the court concludes that Ciurinskas made false written and oral statements under oath in order to obtain immigration benefits. *See United States v. Stelmokas,* 100 F.3d 302, 313–14 (3rd Cir.1996).

97. Pursuant to the visa issued based upon his status under the DPA, Ciurinskas entered the United States on October 24, 1949, at New York City. Stipulation 30.

98. On September 23, 1954, Kazys Ciurinskas filed an Application to File Petition for Naturalization and a Statement of Facts for Preparation of Petition (jointly called a Form N–400). Stipulation 31.

99. During the naturalization application process applicable when Kazys Ciurinskas applied for naturalization in 1954–1955, naturalization examiners reviewed the applicant's Form N–400 and supporting documents, then interviewed the applicant. Stipulation 32.

100. During the naturalization application process applicable when Kazys Ciurinskas applied for naturalization in 1954–1955, the naturalization examiner and the applicant reviewed the entire Form N–400 orally with the applicant while the applicant was under oath to ensure its accuracy. Stipulation 33.

101. During the naturalization application process applicable when Kazys Ciurinskas applied for naturalization in 1954–1955, an applicant was required to be able to understand and answer in English the questions put to him or her. Stipulation 34.

102. During the naturalization application process applicable when Kazys Ciurinskas applied for naturalization in 1954–1955, the applicant signed the affidavit at the end of the Form N–400 in the presence of the naturalization examiner. Stipulation 35.

103. On December 20, 1954, Kazys Ciurinskas stated under oath in the presence of an INS naturalization examiner that he knew the contents of the Form N–400 and that the information he had provided in it was true to the best of his knowledge and belief. Stipulation 36.

104. Question 8 on the Form N–400 asked the applicant to list the "organizations" the applicant had belonged to, prior to the last ten years, in any country. Ciurinskas's response to the question was "none." Ex. 136. This written answer, and Ciurinskas's subsequent sworn oral statement verifying the accuracy of this answer, was a knowing falsehood, intended to conceal his service in the Schutzmannschaft. The court reaches this conclusion, among other reasons, because:

a. The "Instructions to Applicant" section of the Form N–400 warned the applicant to fill out the form completely because misrepresentations could lead to revocation of citizenship. An applicant not motivated by the desire to conceal past activities would therefore err on the side of over-, not under-, disclosure on the Form N–400,

and so Ciurinskas would have listed the Lithuania Self–Defense Battalion as an organization he had belonged to in 1941–42. Cf. *Kalejs v. I.N.S.*, 10 F.3d 441, 445 (7th Cir.1993);

b.  Standard operating procedure was for the naturalization examiner to review each question on the form with the applicant and verify the correctness of the answer. For applicants who claimed to have no organizational affiliations, but were of an age to have been eligible for military service during World War II, standard operating procedure called for the examiner to make further inquiries. Thus, Ciurinskas would have been asked about military service during WWII, and, had he revealed service in either the Schutzmannschaft or a Lithuanian Self Defense Battalion, these facts would have been noted by the examiner on the form. Report of Irving Aaron Chavin, Ex. 135 at 2–5. No such information appears on Ciurinskas's N–400. Ex. 136.

105.  Question 18(c) on the Form N–400 asked whether the applicant had now, or ever, "given false testimony to obtain benefits under the immigration or naturalization laws." Based on court's FOF 96 and 104, Ciurinskas's written answer "no" to this question, Ex. 136, and subsequent sworn oral statement verifying the accuracy of his answers, were both willful misrepresentations which helped to conceal his wartime service in the Schutzmannschaft.

106.  Standard operating procedure, if a naturalization examiner learned that an applicant had served in the Schutzmannschaft or in a · Lithuanian Self–Defense Battalion, would have been to stay any decision on the application and instead continue the application for further investigation by a filed office. Report of Irving Aaron Chavin, Ex. 135 at 5.

107.  An applicant who willfully misrepresented material facts about wartime service in the Schutzmannschaft during his application for citizenship would not have been recommended for citizenship. Report of Irving Aaron Chavin, Ex. 135 at 5–6.

108.  Ciurinskas's misrepresentations in answering questions 8 and 18(c) on the Form N–400 and the facts concealed thereby regarding his service in the Schutzmannschaft would have influenced the determination as to his naturalization. Report of Irving Aaron Chavin, Ex. 135 at 4–6.

109.  On December 20, 1954, Kazys Ciurinskas filed with the INS a Petition for Naturalization (Form N–405). Stipulation 38.

110.  In the N–405, Kazys Ciurinskas stated under oath that he had lawfully entered the United States. Stipulation 39; Ex. 137.

111.  In the N–405, Kazys Ciurinskas stated under oath that he was a person of good moral character, attached to the principles of the Constitution and well disposed to the good order and happiness of the United States. Stipulation 40; Ex. 137.

112.  During the naturalization application process applicable when Kazys Ciurinskas applied for naturalization in 1954–1955, the applicant swore that the information in the Petition (Form N–405) was correct. Stipulation 41.

113.  Kazys Ciurinskas became a naturalized citizen of the United States on February 17, 1955 and was issued Certificate of Naturalization No. 7262096. Stipulation 42.

114.  Kazys Ciurinskas has remained a citizen of the United States since February 17, 1955. Stipulation 43.

*CONCLUSIONS OF LAW*

115.  The subject-matter of this action is within the court's jurisdiction over this matter.  28 U.S.C. § 1345; 8 U.S.C. § 1451(a).

116.  The right to acquire United States citizenship is precious, and evidence justifying revocation of citizenship must be clear, unequivocal and convincing. *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746–47, 66 L.Ed.2d 686 (1981). *United States v. Kairys*, 782 F.2d 1374, 1378 (7th Cir. 1986). "[B]ecause of the grave consequences incident to denaturalization proceedings ... a burden rests on the Gov-

ernment to prove its charges by clear, unequivocal and convincing evidence which does not leave the issue in doubt." *Klapprott v. United States,* 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L.Ed. 266, 276 (1949); *see also Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988); *Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 1336–37, 87 L.Ed. 1796 (1943).

117. No person may be naturalized as a United States citizen who was not lawfully admitted for permanent residence. 8 U.S.C. § 1427(a).

118. An order admitting a person to United States citizenship may be revoked and set aside, and that person's certificate of naturalization canceled, on the grounds that such order and certificate were illegally procured. 8 U.S.C. § 1451(a).

119. Because of the importance of the interests at stake, "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured' and naturalization that is unlawfully procured can be set aside." *Fedorenko,* 449 U.S. at 506, 101 S.Ct. at 747 8 U.S.C. § 1451(a); *United States v. Schmidt,* 923 F.2d 1253, 1257 (7th Cir.1991).

120. Ciurinskas could not have lawfully procured United States citizenship in 1955 if he failed to enter the United States in 1949 lawfully by means of a valid immigration visa. 8 U.S.C. § 1427; *Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. at 751; *Schmidt,* 923 F.2d at 1257.

*Count I: Assistance in Persecution*

121. Section 3(a) of the DPA made immigration visas available to "eligible displaced persons." 62 Stat. 1010. Any person who "assisted the enemy in persecuting civil populations" was excluded from the definition of an "eligible displaced person." DPA § 2(b), 62 Stat. 1009 (incorporating the definition of "displaced person" in Annex I of the Constitution of the International Refugee Organization); *see Fedorenko,* 449

U.S. at 495 n. 3 & n. 4, 101 S.Ct. at 741 n. 3 & n. 4.

122. "Persecution" means " 'the infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.,* race, religion, political opinion, etc.), in a manner condemned by civilized governments.' " *Schmidt,* 923 F.2d at 1256 n. 6 (quoting *Schellong v. U.S.INS,* 805 F.2d 655, 662 (7th Cir.1986)).

123. The activities of the 2nd Company, 2nd Schutzmannschaft Battalion, that is: under German direction aiding in the execution of suspected Jews and Communists, by guarding the perimeter of a town to prevent its inhabitants from fleeing, shooting at those trying to flee, aiding in searching the town, herding persons from the town to an execution site outside of town, digging burial pits, guarding a Fort where executions were being carried out, guarding a ghetto where persons were detained until they could be executed, doing the actual shooting of the persons, or engaging in any similar activity described in the court's findings of fact and established by the evidence in this case; constitute assisting the enemy in persecuting civil populations within the meaning of DPA § 2(b). *See Kairys,* 782 F.2d at 1377–78.

124. Under DPA § 2(b), having either voluntarily or involuntarily assisted in persecution renders a person ineligible for displaced person status. *Fedorenko,* 449 U.S. at 512, 101 S.Ct. at 750; *Schmidt,* 923 F.2d at 1258.

125. The fact of armed, uniformed, service in the 2nd Company, 2nd Schutzmannschaft Battalion is sufficient to constitute assistance in persecution. *Cf. Schmidt,* 923 F.2d at 1259 (service in SS as concentration camp guard constitutes assistance in persecution).

126. As specified in the court's factual findings, the United States has shown, by clear and convincing evidence, that by serving in the 2nd Company of the 2nd Battalion of the Lithuanian Schutzmannschaft, defendant Ciurinskas assist-

ed the enemy in persecuting civilian populations.

127. Therefore, the United States has shown, by clear and convincing evidence, that defendant Ciurinskas was not an eligible displaced person under the DPA, making him ineligible to immigrate to the United States under the DPA, making his entry to the United States for permanent residence in 1949 unlawful and his procurement of naturalization as a United States citizen on February 17, 1955, illegal. *See Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. at 751–52.

*Count II: Voluntary Assistance to Enemy Forces*

128. Any person who "voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations" was excluded from the definition of an "eligible displaced person." DPA § 2(b), 62 Stat. 1009.

129. The United States has shown, by clear and convincing evidence, that the 2nd Company, 2nd Schutzmannschaft Battalion assisted the German military by guarding barracks and supply warehouses, performing police functions to maintain order in occupied territories, guarding ghettoes where Jews and other perceived enemies of the German state were interred, and aiding in the execution of those suspected to be Jews, Communists, Russian partisans or persons giving aid to Russian partisans.

130. The United States has shown, by clear and convincing evidence, that defendant Ciurinskas's service in the 2nd Company, 2nd Schutzmannschaft Battalion was voluntary and therefore, that he voluntarily assisted enemy forces in operations against the United Nations.

131. Therefore, the United States has shown, by clear and convincing evidence, that defendant Ciurinskas was not an eligible displaced person under the DPA, making him ineligible to immigrate to the United States under the DPA, making his entry to the United States for permanent residence in 1949 unlawful and his procurement of naturalization as a United States citizen on February 17, 1955, illegal. *See Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. at 751–52.

*Count III: Membership or Participation in a Hostile Movement*

132. Section 13 of the DPA prohibited issuance of an immigration visa to any person who was a member in or participated in a movement hostile to the United States. DPA § 13, 62 Stat. 1014.

133. The United States has shown, by clear and convincing evidence, that the Lithuanian Schutzmannschaft, because it was considered to be an organization inimical to the United States, and because it assisted the German military as described in the findings of fact and conclusions of law herein, was a movement hostile to the United States. *See Stelmokas,* 100 F.3d at 314.

134. Therefore, the United States has shown, by clear and convincing evidence, that defendant Ciurinskas was a member of and participant in a movement hostile to the United States.

135. As a result, the United States has established, by clear and convincing evidence, that defendant Ciurinskas was ineligible to immigrate to the United States pursuant to DPA § 13, making his entry to the United States for permanent residence in 1949 unlawful and his procurement of naturalization as a United States citizen on February 17, 1955, illegal. 8 U.S.C. § 1427.

*Count IV: Acquiescence in Conduct Contrary to Civilization and Human Decency*

136. In 1949 at the time defendant Ciurinskas's immigration visa to the United States was approved 22 C.F.R. § 53.32(a) provided: "No permit to enter [the United States] shall be issued to any alien if the permit-issuing authority has reason to believe that the entry of the alien would be prejudicial to the interests of the United States."

137. In 1949 at the time defendant Ciurinskas's immigration visa to the United States was approved 22 C.F.R. § 53.33(j) provided in relevant part: "The entry of an alien who is within one

of the following categories shall be deemed to be prejudicial to the interests of the United States ... (j) ... an alien ... who has advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during [World War II]."

138. As specified in the court's findings of fact, defendant Ciurinskas was both aware of, and assisted in, Lithuanian Schutzmannschaft activities directed against Jews, Communists, Bolsheviks and others, many of whom were children, that were contrary to civilization and human decency.

139. Defendant Ciurinskas's participation in that conduct, whether active or passive, constituted acquiescence in activities and conduct contrary to civilization and human decency on behalf of the Germans.

140. The United States has therefore established, by clear and convincing evidence, that defendant Ciurinskas was made ineligible for an immigration visa by 22 C.F.R. §§ 53.32 & 53.33(j), making his entry to the United States in 1949 unlawful and his procurement of naturalization as a United States citizen on February 17, 1955, illegal. 8 U.S.C. § 1427.

*Count V: Willful Misrepresentation under the DPA*

141. Section 10 of the DPA barred from immigration "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States." DPA § 10, 62 Stat. 1013.

142. DPA § 10 applies only to "material" misrepresentations. *Fedorenko,* 449 U.S. at 507, 101 S.Ct. at 748.

143. The Supreme Court has defined "material," for the purposes of 8 U.S.C. § 1451(a), as a concealment or misrepresentation which would have a natural tendency to influence the relevant decisions at issue. *Kungys,* 485 U.S. at 771–772, 108 S.Ct. at 1547.

144. The Court has not held that "material," for § 1451(a) purposes, is the same as "material" in the DPA and regulations governing the issuance of immigra-tion visas. *Fedorenko,* 449 U.S. at 508–09, 101 S.Ct. at 751–52.

145. In *obiter dicta* in *Kungys,* the Court observed that "federal courts have long displayed a quite uniform understanding of the 'materiality' concept as embodied in such [federal criminal] statutes, and that the "gravity of the consequences" flowing from denaturalization are "not so different as to justify adoption of a different standard." *Kungys,* 485 U.S. at 770, 108 S.Ct. at 1546. For these reasons, the court uses the *Kungys* definition of "material" in determining whether defendant Ciurinskas made material misrepresentations under DPA § 10.

146. As explained in the court's findings of fact, defendant Ciurinskas wilfully misrepresented and concealed his service in the Lithuanian Self Defense Battalion/Schutzmannschaft when seeking "displaced person" status under the DPA at several steps in the process: on his IRO Resettlement Registration form (where he reported that he was a "miller at his own mill" in 1941–42), during his interview by a CIC investigator, and during his interview by a United States vice-consul. Had Ciurinskas revealed his service in either a Lithuanian Self Defense Battalion of the Schutzmannschaft, either his application for immigration would have been denied outright, or further investigation would have resulted and Ciurinskas would have been required to prove that he had been conscripted and had no personal involvement in the commission of atrocities. The United States has established by clear and convincing evidence that defendant Ciurinskas's concealments and misrepresentations had a natural tendency to, and did, influence the decision whether to grant him a visa. Thus, defendant Ciurinskas's misrepresentations and concealments were "material" under DPA § 10.

147. As a result, Ciurinskas's immigration visa obtained under DPA § 10 was invalid and Ciurinskas's entry to the United States for permanent residence in 1949 was unlawful. This in turn made his

procurement of naturalization as a United States citizen on February 17, 1955, illegal. 8 U.S.C. § 1427.

### Count VI: Lack of Good Moral Character

148. At all relevant times, § 427(a)(3) of the INA provided that "[n]o person ... shall be naturalized unless such [person] ... during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States." 8 U.S.C. § 1427(a)(3).

### A. Persecution

149. Because he voluntarily joined the Schutzmannschaft, acquiesced to, assisted and/or participated in the persecution of civilian populations, defendant Ciurinskas lacked good moral character and did not qualify for naturalization under 8 U.S.C. § 1427(a)(3). *Cf. United States v. Schiffer,* 831 F.Supp. 1166, 1197–99 (E.D.Pa.1993) (voluntary service as *Waffen*-SS guard at concentration camps.)

150. Because defendant Ciurinskas did not qualify for naturalization under § 1427(a)(3), his naturalization as a United States citizen on February 17, 1955, was illegally procured and may be revoked and canceled. 8 U.S.C. § 1451(a).

### B. False Testimony

151. Section 101(f) of the INA deems those who give false testimony in order to obtain benefits under the Act to be persons lacking good moral character:

No person shall be regarded as, or found to be, a person of good moral character ... (6) ... who has given false testimony for the purpose of obtaining any benefits under this Act.

8 U.S.C. § 1101(f)(6).

152. There is no requirement that the false testimony concern a material matter. *Kungys,* 485 U.S. at 779–80, 108 S.Ct. at 1551.

153. As specified in the court's factual findings, defendant Ciurinskas in an oral statement before the Naturalization Examiner swore that he knew the contents of his N–400 and that the contents were true to the best of his knowledge and belief, thereby testifying that 1) he had never been a member of any organization prior to 1944 in the United States or any other country and that 2) he had never given false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws. Both of these testimonial statements were false.

154. Based upon defendant Ciurinskas's pattern of conduct, that is, concealing his membership in the Schutzmannschaft on numerous occasions during the immigration and naturalization process, and because, as noted in FOF 104(a), a candid applicant would be motivated to disclose too much, rather than too little, the court concludes that the United States has established, by clear and convincing evidence, that defendant Ciurinskas's false testimony was given with the subjective intent of obtaining immigration benefits.

155. As a result, defendant Ciurinskas, at the time of his naturalization, lacked the necessary good moral character and thus illegally procured his naturalization. 8 U.S.C. §§ 1101(f)(6), 1427(a)(3) and 1451(a).

### Count VII: Procurement of Citizenship by Willful Concealment or Misrepresentation

156. Naturalization that was procured by "concealment of a material fact or by willful misrepresentation" in the naturalization, as opposed to immigration, process, may be revoked and canceled. 8 U.S.C. § 1451(a); *Kungys,* 485 U.S. at 773, 108 S.Ct. at 1547–48.

157. As previously noted, a misrepresentation or concealment that would have a natural tendency to influence the decision maker is material. *Kungys,* 485 U.S. at 771–72, 108 S.Ct. at 1547.

158. As specified in the court's factual findings, during his application for naturalization defendant Ciurinskas made two misrepresentations: that he had belonged to no organizations prior to 1944, and that he had never given false testimony in order to gain benefits under the immigration and naturalization laws.

Both of these misrepresentations were intended to, and did, conceal Ciurinskas's service in the Schutzmannschaft. The United States has established, by clear and convincing evidence, that these misrepresentations and concealment were material as having a natural tendency to affect the naturalization examiner's decision.

159. As a result, the United States has established, by clear and convincing evidence, that defendant Ciurinskas procured his naturalization by misrepresentation and concealment of material facts.

## CONCLUSION

For the foregoing reasons, the United States is entitled to the judgment it seeks. A separate order for entry of judgment is issued herewith.

**SO ORDERED.**

## *ORDER FOR ENTRY OF JUDGMENT*

The Clerk is **ODERED** to **ENTER FINAL JUDGMENT** as follows.

It is hereby **ORDERED, ADJUDGED,** and **DECREED** that the naturalization order of this court entered February 17, 1955, granting United States citizenship to Kazys Ciurinskas is **REVOKED AND SET ASIDE,** and that Certificate of Naturalization No. 7262096 is **CANCELED.** It is further **OREDERED** that Kazys Ciurinskas shall, upon receipt of this order, **SURRENDER** Certificate of Naturalization No. 7262096 to the Attorney General.

The Clerk shall send a certified copy of this order and the Clerk's final judgment entry to the Attorney General. 8 U.S.C. § 1451(f).

**SO ORDERED.**